JOHN L. MARKS, ET AL., ETC.

V.

RICHARD DOUGLAS SANZO, AN INFANT, ET AL.

Record No. 830002

June 13, 1986

Present: All the Justices

*Leonard A. Wallin, II, Assistant City Attorney (Robert V. Beale, City Attorney*, on briefs), for appellants.

*Bolling R. Powell, Jr. (John Ward Bane*, on brief), for appellees.

CARRICO, C.J., delivered the opinion of the Court.

On April 7, 1981, Richard Douglas Sanzo, an infant, by his adoptive father and next friend, Joseph Tony Sanzo, filed a bill of complaint against John L. Marks and others, Trustees of the City of Newport News Employees' Retirement Fund. The bill alleged that Richard was the sole surviving child of Charles Louis Sanzo, a city firefighter who died February 2, 1969, from injuries received in the line of duty. The bill sought the entry of a decree requiring the Trustees to accord Richard Sanzo full death benefits payable from the Retirement Fund.

In response, the Trustees admitted that Charles Sanzo died in the line of duty and that he was a member in good standing of the Retirement Fund at the time of his death. The Trustees denied, however, that Richard was the child of Charles Sanzo or a beneficiary under the terms of the retirement ordinance in effect at the time of Charles Sanzo's death.

The chancellor heard the matter ore tenus and ruled in a letter opinion that Richard was the child of Charles Sanzo. In a final decree, the chancellor ordered the Trustees to pay Richard death benefits of $310.42 per month from the date of Charles Sanzo's death, together with interest at statutory rates "from the time each said monthly installment was due and payable."

The record shows that Charles Sanzo became a firefighter for the City of Newport News on January 25, 1965. In March of the same year, he met and "fell in love" with Patricia Mable Shelton. He moved into her home, and they lived together until his death in 1969. Although they never went through a marriage ceremony, the chancellor found that they "represented themselves to the community as married."

Patricia Shelton gave birth to a son, the child involved in this case, on August 18, 1966. The child's birth certificate showed his name as Richard Douglas Shelton, and a space provided for the name of the father was left blank. The child lived with his mother and Charles Sanzo until the latter's death. Charles Sanzo did not notify the Retirement Fund that he had a son. Consequently, upon

the death of Charles, the Fund paid Charles' mother, Madeline Sanzo, death benefits of $3,141.10.[1]

Approximately one year after Charles Sanzo's death, Patricia Shelton disappeared "in the middle of the night," taking Richard with her. Later, Charles' parents, Madeline and Joseph Sanzo, learned Richard was in the custody of the "Welfare in California" and that "he was going to be adopted out." The senior Sanzos obtained custody of Richard and brought him to their Hampton, Virginia home in June, 1975. They instituted proceedings to adopt Richard, and by order entered December 10, 1976, the Circuit Court of the City of Hampton allowed the adoption and the change of Richard's name from Shelton to Sanzo.

On September 2, 1980, Richard Sanzo, by his adoptive father and next friend, filed application with the Retirement Fund for the payment of benefits allegedly due Richard as the surviving child of Charles Sanzo. On November 25, 1980, the Fund denied the application, and this litigation followed.

In the trial court, the Trustees contended that Code § 20-61.1[2] required Richard Sanzo to prove Charles Sanzo had admitted in court he was Richard's father or had voluntarily admitted paternity in writing, under oath. In their appellate briefs, the Trustees argued that the chancellor had erred in failing to impose the § 20-61.1 burden of proof upon Richard Sanzo.

In oral argument, however, the Trustees conceded that Code § 20-61.1 no longer applied because the version of the statute upon which they relied was held unconstitutional in *Jones* v.

---

[1] Under § 32-24 of the City's retirement ordinance, the surviving widow of a member of the Retirement Fund is entitled to death benefits. If there is no widow, the benefits are paid to the surviving child or children under eighteen. If no widow or child survives, the benefits are paid to a dependent father or mother.

[2] At the time of Charles Sanzo's death, Code § 20-61.1 provided:

Whenever in proceedings hereafter under this chapter concerning a child whose parents are not married, a man admits before any court having jurisdiction to try and dispose of the same, that he is the father of the child or the court finds that the man has voluntarily admitted paternity in writing, under oath, the court may then enter and enforce judgment for the support, maintenance and education of such child as if the child were born in lawful wedlock.

Notwithstanding the provisions of § 19-241.1 or any other law, the judge or other court officer before whom a man has admitted paternity of any child, whose support is the subject of any proceeding brought under the provisions of this chapter, may testify, in any court having jurisdiction to conduct proceedings under this chapter, as to any admission of paternity made by such man in his court and as to any other facts directly affecting the relevancy or probative value of such admission.

*Robinson*, 229 Va. 276, 287, 329 S.E.2d 794, 802 (1985), decided after appellate briefs were filed in the present case.[3] The Trustees also conceded in oral argument that proof by a preponderance of evidence was Richard Sanzo's proper burden. The Trustees insisted, however, that Richard Sanzo had failed to prove paternity even under this lesser burden of proof.

In their appellate briefs and in oral argument, the Trustees also contended that the chancellor erred in relying upon Code § 65.1-66, a part of the Workers' Compensation Act, to establish the standard of proof of paternity in this case. The Trustees say this was an attempt by the chancellor to combine the Workers' Compensation Act with the City's Retirement Fund when, in fact, there is no connection between the two and any effort to equate one with the other would be "totally inappropriate."

We cannot find, however, where the chancellor even mentioned the Workers' Compensation Act or Code § 65.1-66 either in his letter opinion or in his final decree. Code § 65.1-66 does define the term "child," as used in the section, to include "an acknowledged illegitimate child" and the chancellor did use the term "acknowledged" when ruling in his letter opinion that Richard was Charles Sanzo's child. But this does not mean the chancellor "combined" the Workers' Compensation Act with the City's Retirement Fund.

As Richard Sanzo suggests, the chancellor may have consulted the Workers' Compensation Act for guidance in determining the meaning of the term "child," as used in the City's retirement ordinance. The ordinance does not define "child," but it does define a compensable death as one "arising out of and in the course of employment from a cause compensable under the Virginia Workmen's [now Workers'] Compensation Act." Given the ordinance's lack of a definition of the term "child" and its reference to the Workers' Compensation Act for the definition of a compensable death, we think it was not inappropriate for the chancellor to consult the Act for guidance in determining the meaning of the term "child," if he did, in fact, consult the Act.

But whether the chancellor was prompted to employ the term "acknowledged" from consulting the Workers' Compensation Act or from the use of his own common sense, the result is the same. Reliance upon a putative father's acknowledgment of

---

[3] The General Assembly amended Code § 20-61.1 in 1982, Acts 1982, ch. 307, to permit consideration of the results of genetic blood grouping tests. The holding of unconstitutionality in *Jones* v. *Robinson* was limited to the pre-1982 version of the Code section.

paternity is certainly a logical and satisfactory way of deciding the difficult questions involved in this type of case.

The record in the present proceeding abounds with instances of acknowledgment by Charles Sanzo that Richard was his child. These acknowledgements were made not only to Charles Sanzo's mother, who became Richard's adoptive mother, but also to a number of witnesses who had no interest, financial or otherwise, in the outcome of the case.

Notable in this group of disinterested witnesses was Eugene M. Jordan, an attorney. He testified that Charles Sanzo and Patricia Shelton consulted him on February 2, 1968, when Richard was approximately 18 months old, about having the child's surname changed from Shelton to Sanzo. In Jordan's conversation with Charles and Patricia, they represented themselves as husband and wife, and Charles stated he was Richard's "natural father." The change of name, however, had not been accomplished by the time Charles Sanzo died.

We are of opinion that the evidence concerning Charles Sanzo's acknowledgment of paternity, coupled with other evidence showing his treatment of the child as his own, was more than sufficient to carry Richard's burden of proof by a preponderance of the evidence. The City offered nothing to contradict Richard's evidence in any way. Accordingly, we hold that the chancellor's finding of paternity was amply supported by evidence.

The Trustees argue, however, that the trial court erroneously admitted into evidence certain hearsay statements made by Patricia Shelton concerning Richard's paternity and that when this evidence is disregarded, the remaining evidence is insufficient to support the chancellor's finding of paternity. We disagree with the Trustees.

The trial court admitted the disputed evidence under the pedigree exception to the hearsay rule. This exception "allows consideration of hearsay evidence regarding a person's family relationship as proof of the existence of the relationship." *Smith* v. *Givens*, 223 Va. 455, 459, 290 S.E.2d 844, 846 (1982).

> Testimony concerning pedigree is well recognized as an exception to the hearsay rule, provided that no . . . better evidence can be obtained, and that the declarant or source of the witness' information was a member of the family or related to the family, whose history the fact concerns, and was deceased or out of the State.

*Rawles* v. *Bazel*, 141 Va. 734, 755, 126 S.E. 690, 696 (1925).

The Trustees argue that the pedigree exception is inapplicable here because it was not shown that Patricia Shelton was "deceased or out of the State" at the time of trial. The evidence on this point shows that Patricia Shelton disappeared with Richard from the Tidewater area of Virginia approximately one year after the death of Charles Sanzo in February, 1969. She apparently went to California because Richard became a ward of the Welfare Department of that state and Patricia was on probation or parole in the early 1970s for an offense committed there. In 1972 or 1973, Madeline Sanzo received a Valentine Day's card from Patricia postmarked in Texas. Since that time, Madeline Sanzo has not received "any word as to [Patricia's] whereabouts."

In preparation for trial, counsel for Richard Sanzo employed Rick Tvelia, a private investigator, in an attempt to determine the whereabouts of Patricia Shelton. In the four and one-half month period preceding the trial, Tvelia conducted an investigation in Virginia, California, and Texas by mail and telephone, consuming some 15 to 20 hours, in an attempt to find Patricia. Tvelia was unable to find her or to learn anything concerning her whereabouts other than the information she was on probation or parole in California in the early 1970s.

Prior to trial, a witness summons was issued for Patricia Shelton. The summons was returned "not found."

Under these circumstances, we think Richard Sanzo made a prima facie showing that Patricia Shelton was "deceased or out of the State" and thus not available as a witness either by way of deposition or personal appearance. The Trustees offered no evidence to rebut this prima facie showing. Hence, the trial court did not err in admitting Patricia Shelton's statements concerning Richard's paternity.

The Trustees' final contention concerns the chancellor's allowance of interest "from the time each . . . monthly installment [of death benefits] was due and payable" to Richard Sanzo. The Trustees argue that they "did not know, and could not have known, about Mr. Richard Douglas (Shelton) Sanzo's retirement benefit application until it was actually made in 1980." Hence, the Trustees say, "[i]t is wrongheaded to conclude that interest payments should be due on installment payments concerning which the . . . Trustees could not have reasonably anticipated payment." We disagree with the Trustees.

While the Trustees may not have known of Richard's *application* for retirement benefits until it was actually filed in 1980, they concede on brief that they knew of Richard's *existence* at the time they awarded death benefits to Madeline Sanzo in 1970. This knowledge on the part of the Trustees was derived from a memorandum dated March 20, 1969, some six and one-half weeks after Charles Sanzo's death. Authored by the City Attorney, the memorandum apparently was written in response to a claim made on Richard's behalf for payment of benefits under the Workmen's (now Workers') Compensation Act. In the memorandum, the City Attorney opined that "no award for workmen's compensation should be made" because the evidence indicated Charles Sanzo had "never acknowledged, under oath or otherwise, that Richard Douglas Shelton is his legal son."

But aside from the question of the Trustees' knowledge, whether interest should have been awarded and, if so, from what date interest should run, were matters within the sound discretion of the chancellor. Code § 8.01-382; *Doyle & Russell* v. *Welch Pile Driving*, 213 Va. 698, 703, 194 S.E.2d 719, 723 (1973).

> The award of prejudgment interest is to compensate Plaintiff for the loss sustained by not receiving the amount to which he was entitled at the time he was entitled to receive it, and such award is considered necessary to place the [plaintiff] in the position he would have occupied if the party in default had fulfilled his obligated duty.

*Employer-Teamsters, Etc.* v. *Weatherall Concrete*, 468 F. Supp. 1167, 1171 (1979).

In awarding interest "from the time each . . . monthly installment [of death benefits] was due and payable," the chancellor obviously concluded that Richard Sanzo had suffered loss by not receiving death benefits to which he was entitled when he was entitled to receive them. Upon the record in this case, we cannot say this conclusion was plainly wrong; neither, therefore, can we say the chancellor abused the discretion vested in him.

We do not overlook the fact that the Trustees, in apparent good faith, paid death benefits to Madeline Sanzo. Richard Sanzo, however, has agreed that if he receives a favorable ruling in this case, the amount paid Madeline Sanzo "will be repaid or credited, together with interest from the time it was paid."

We will affirm the judgment appealed from. In view of Richard Sanzo's agreement concerning the payment to Madeline Sanzo, we will remand the cause so the trial court can supervise the allowance of a credit against the judgment when it is paid, in accordance with the agreement.

*Affirmed and remanded.*