## CIRCUIT COURT OF HENRICO COUNTY

Farmville Investment Group, L.L.C.

v.

Prospect Homes of Richmond, Inc.

April 27, 2009

Case No. CL06-2477

BY JUDGE CATHERINE C. HAMMOND

This matter is before the Court following a trial without a jury on March 24, 25, and 26, 2009. The case turns on two written contracts and the duties of the parties under those agreements. The parties submitted excellent post-trial memoranda.

The agreements govern the development of residential subdivisions in Farmville, Virginia. The first contract, dated April 29, 2005, described 71 lots in neighborhoods named Cabell's Ridge, Pondview, and Creekview. The second contract, dated November 10, 2005, described 99 lots in a subdivision named Jesse's Ridge. Each party now contends that the other is in breach. Farmville Investment Group, L.L.C. (FIG) argues that it developed the real property and fulfilled its duties, triggering Prospect's duty to purchase the lots. Prospect admits that it has not purchased all of the lots. It argues that FIG's earlier breach of contract relieved Prospect of the obligation to purchase additional lots. In addition, Prospect's counterclaim seeks rescission and demands that FIG buy back 22 lots that were sold to Prospect.

From the evidence, this Court draws the following findings of fact and conclusions of law.

In 2005, Prospect began building houses in Cabell's Ridge. Closing on the lots was scheduled to occur in three phases, on dates when the roads were built. The contract anticipated closing dates in June and July 2005 and in March 2006. Prospect complied with the first two, in July and October 2005, acquiring 39 out of 71 lots. Around this time, Prospect wanted even mote lots and asked the local real estate broker, Mr. Brooks, about finding additional property to develop. In response to Prospect's inquiry and its desire to do a similar deal, FIG found the land for Jesse's Ridge and obtained financing from the Bank of Goochland. FIG borrowed this money in reliance upon Prospect's commitment to buy additional building lots. In November 2005, they signed the Jesse's Ridge contract, which was almost identical to the earlier agreement.

In 2006, when the time came to close on the third and final group of 32 lots in Cabell's Ridge, problems arose. Prospect's sales were slowing down. At Prospect's request, FIG and Prospect agreed to modify the schedule, with Prospect closing on 16 lots in March 2006 and another 16 lots in May 2006. In March, Prospect purchased 16 lots, but, in May, Prospect advised that it would only take 8 of the remaining 16 lots in Cabell's Ridge. At Prospect's request, the parties agreed again to change the schedule and set a closing date of September 1, 2006, for the final 8 lots. (PX 68.) In the meantime, FIG undertook expenses to develop the Jesse's Ridge lots, which were scheduled for delivery to Prospect in June and December of 2006 or as soon as the roads were built.

By the end of August 2006, Prospect had built and sold 12 houses in Cabell's Ridge. Additional houses were built or under construction. However, Prospect faced financial problems. Prospect's Chief Financial Officer and its owner, Mr. Audi, both testified that Prospect made a decision in the summer of 2006 that Prospect would not go through with the Jesse's Ridge agreement. They did not communicate this decision to FIG. FIG continued to use borrowed funds to complete the site work at Jesse's Ridge. However, the parties did discuss, in the Summer of 2006, issues respecting the design of certain lots in Cabell's Ridge, the location of sewer taps, and whether lots would accommodate gravity sewers. Prospect assured FIG that it would buy the 8 remaining lots in Cabell's Ridge. On August 19, 2006 Mr. Audi stated that he "still wanted to stay in the deal."

On the closing date, September 1, 2006, FIG delivered deeds to the 8 remaining lots in Cabell's Ridge. Prospect refused to close. Mr. Audi told Mr. Brooks that, unless FIG would let Prospect out of the Jesse's Ridge contract,

Prospect would not purchase the 8 lots left in Cabell's Ridge. FIG gave notice of default on September 1, 2006. This action commenced on September 26, 2006. Soon afterwards, on November 4, Prospect refused to close on the first group of lots that were ready in Jesse's Ridge.

After receiving notice of default, Prospect hired a consultant to examine environmental and regulatory requirements for the subdivisions. This was in defense of FIG's claims. Mr. Audi testified that he did not have concerns about wetlands, storm water, flooding, drainage, erosion, or water quality until after September 1, 2006. The Town of Farmville had already approved the subdivisions, roads, and sewer; FIG understood that all of the lots were ready for building. Neither did FIG have any knowledge of regulatory problems before September of 2006. When Mr. Harper found out that Prospect had hired the consultant, Mr. Harper assured Mr. Audi that, if the consultant found a problem, FIG would fix it.

In November 2006, Prospect's consultant reported that land disturbance in Cabell's Ridge required wetlands approvals from the Corps of Engineers (COE). The consultant was not asked to examine the property in Jesse's Ridge. Once his report was delivered to Prospect, their engagement ended. Then FIG engaged the same consultant to look at both Cabell's Ridge and Jesse's Ridge and make application to the COE. In early 2007, the COE granted wetlands permits and no wetlands problem remains in either subdivision.

FIG also researched the need for permits respecting storm water, which has been regulated by the Virginia Department of Conservation and Recreation (DCR) since 2005. Virginia regulates the discharge of storm water from construction projects as it can affect both water quality and water quantity. Under DCR's delegation, the Town of Farmville oversees erosion and sediment control, but does not operate a storm water program. The Town had approved erosion and sediment control plans, but there was some confusion about the Town's authority during the development project. For example, the Town did not provide land disturbance information to the state. Thus DCR did not have notice of construction in these subdivisions. Neither FIG nor local government officials were aware of DCR's requirements until 2007. FIG's call to DCR began the permitting process.

In 2008, DCR issued storm water permits for a portion of Jesse's Ridge. DCR has not advised that a permit is required for Cabell's Ridge. To the contrary, DCR's enforcement agent has advised that a permit is not required there. FIG would need additional approval from DCR to build in Jesse's Ridge in the area which remains vacant.

The Town of Farmville considers the subdivisions approved with no reservations. The Town would issue building permits for homes on every lot in both Cabell's Ridge and Jesse's Ridge. All bonds have been released.

Michael White testified as an expert engineer for Prospect. He was retained by Prospect in 2008 and then performed a detailed floodplain analysis for the Cabell's Ridge properties. Mr. White determined that certain lots are likely to suffer flooding or serious erosion. In his opinion, the Cabell's Ridge properties were not designed correctly to consider storm water drainage. In addition, although his study area did not include the Jesse's Ridge property, Mr. White questioned FIG's performance with respect to water quality, water storage, and water runoff in Jesse's Ridge. In his opinion, FIG did not perform consistently with generally accepted engineering practices, in large part because of incomplete or missing information and analysis.

The dispute in this case centers on paragraphs 5 and 7 of the two agreements. In these paragraphs, FIG had obligations to develop the lots as "Residential Building Lots." FIG also had "to comply with all laws, rules, and regulations of the Town of Farmville, Commonwealth of Virginia, United States of America, and/or any of their respective agencies." Prospect contends that FIG breached its obligation to deliver "Residential Building Lots" in Cabell's Ridge, as many lots are unsafe or unsuitable for home building. Prospect also contends that FIG breached Section 7 by failing to comply with wetlands laws and storm water laws before starting construction in either Cabell's Ridge or Jesse's Ridge. In defense of FIG's claim of anticipatory breach with respect to the second contract, Prospect contends that it could not have been the first party to breach because environmental requirements had to be fulfilled before FIG began construction there in May of 2006, several months before Prospect could have been required to buy any lots pursuant to the trigger, the gravel road, in the contract.

The agreements are not ambiguous. They must be construed according to their plain meaning.

The agreements do not define a "Residential Building Lot," but they do amplify the meaning. For example, the parties expressed the intent that FIG had to provide to every lot the water and sanitary sewer, streetlights, and primary electricity, telephone, and cable TV service. They agreed that FIG had to provide "subdivision landscaping (excluding landscaping on the Lots)" and clearing and grading required for utilities "to each lot line." There is nothing in the agreements about grading inside the lot lines or designing the lots differently from the drawings prepared by FIG before the agreements were signed. The agreements do not state, as Prospect argues in its brief, that the lots "will contain a minimum of negative physical features." To the contrary,

the agreements leave it up to the builder to prepare the building site, at its expense, and the only reasonable inference is that any "negative physical features" are reflected in the price.

In determining the parties' intent as to the quality of the lots, it also must be considered that Prospect did not complain about topography, drainage, or layout until the spring or summer of 2006. Even then, the complaints had a haphazard nature and were not the subject of serious negotiations. For example, in the summer of 2006, Prospect was building houses on lots in Pondview, part of Cabell's Ridge. Houses on lots 15 and 17 were built and sold to third-party homeowners in August and October 2006. Lying in between lots 15 and 17 is Pondview lot 16, which has a stream running through its center. Prospect now contends that lot 16 is essentially worthless. The stream and layout of lot 16 had to be visible to Prospect's construction workers, who were busy all summer on the neighboring Pondview houses. But Prospect's complaint did not take any serious form at that time. The complaints occurred after Prospect had bought most of the lots and after it ran into financial difficulties that were not due to FIG's designs but instead were market based. It must also be considered that the Town of Farmville would permit homes on every lot. The evidence as a whole does not show that FIG failed to deliver "Residential Building Lots" in breach of any warranty of workmanship or any other duty.

The agreements broadly oblige FIG to comply with laws and regulations. There is no time period specified. And there is no contractual language making compliance a condition precedent to Prospect's obligation to purchase the lots. However, the environmental laws and regulations themselves provide the deadline. Wetlands permits and storm water permits must be obtained before construction begins. FIG failed to perform this duty, The question follows whether FIG's failure was a material breach. Failure to perform this promise does not excuse Prospect from performing its contract or give Prospect a right of rescission, unless "the act failed to be performed [goes] to the root of the contract." *Neely v. White*, 177 Va. 358, 366-67, 14 S.E.2d 337 (1941). "The type of evidence required to establish a material breach of contract will vary depending on the facts surrounding a particular contract. *Horton v. Horton*, 254 Va. 111, 116, 487 S.E.2d 200 (1997) (*citing Restatement (Second) of Contracts*, Section 241).

Weight is given to the evidence that FIG was able to comply with the COE and DCR without extensive efforts or unreasonable delay. The COE fairly quickly granted a Nationwide Permit 18 which is an "after-the-fact" permit used to remedy what would have been a violation of the Clean Water Act. Mr. Dodson testified that this is not an enforcement proceeding but is

allowed as a permitting procedure. Likewise, DCR granted approvals within a reasonable time following notice. The testimony respecting DCR procedures showed that it was difficult for FIG to determine its obligations, but once those were clarified by the state and the Town, FIG acted promptly to comply. While there is some evidence to support Prospect's contention that full compliance with storm water rules has not been achieved, such evidence is outweighed by (1) the fact that no enforcement proceeding has been instituted by any government agency and by (2) the unpredictability of risks identified by Mr. White.

Prospect argues that FIG's breach of the permitting obligation is material because it makes Prospect vulnerable to potential enforcement actions. However, in reviewing the cases submitted by Prospect, it is clear that the violations of permit requirements in those cases were much more flagrant. In *In re Heights Subdivision, L.L.C.*, 2009 Bankr. LEXIS 316 (E.D. N.C. 2009), the Court did not hold that failure to comply with storm water requirements is generally a material breach. The Court held that, in the contract before it and on the facts before it, there was a material breach. In the *Heights* contract, the parties had stated, "all temporary and permanent storm water management features must conform with government-approved development plans and pass government inspection." After making that contract, the developer underwent inspections from the South Carolina enforcement agency, received warnings and failed to correct problems. Those are different facts from the instant case, where neither the developer nor DCR knew of any permit requirement, no warnings were issued, and it was FIG who took the initiative to correct the violation.

Prospect argues accurately that there is no right of cure stated in the agreements. However, taking all of the circumstances into account, it is clear that these large subdivisions required multiple, ongoing tasks that sometimes progressed quickly, or not. As Mr. Harper testified on cross-examination, after the gravel road was built in Jesse's Ridge, FIG's work was not done. FIG still had to pave, install utilities, and finish a "punch list." As Mr. Brooks testified, with respect to an August 2006 e-mail, Mr. Harper was "more than willing" to cure problems raised by Prospect. In essence the contracts contemplated give and take on many unspecified obligations. This weighs against a finding that FIG's breach was material.

Finally, in examining FIG's breach it is relevant that Prospect had been building houses in Cabell's Ridge for six months when Prospect signed the Jesse's Ridge agreement. Then another eight months passed before Prospect raised any issue about wetlands permits or storm water permits. It is apparent that these regulatory issues came up at the exact point that Prospect wanted

relief from FIG's claims of default. Mr. Audi testified that, when the wetlands issues were cured, it was not to his benefit. This illuminates his change of heart about building more houses, whether there was environmental compliance or not. Mr. Harper's conduct showed faithfulness to the agreed purpose in the agreements; Mr. Audi's did not.

The breach by FIG was not material and Prospect was not justified in trying to terminate the contracts. Prospect is in breach of its obligation to purchase the remaining lots. The measure of damages is the difference between the contract price and the fair market value at the time of the breach. *Little v. Cooke*, 274 Va. 697, 652 S.E.2d 129 (2007).

The contract price for the Cabell's Ridge lots was $42,000 and the fair market value in the summer of 2006 was $30,612, leaving a damage of $11,388 per lot. There were eight lots at the time of breach, but FIG was able to mitigate its damages by selling two of the Cabell's Ridge lots to another builder. Accordingly, there was no damage to FIG with respect to those two lots in Cabell's Ridge, and the total of FIG's damages on the first contract is $68,328. The contract price for the Jesse's Ridge lots was $46,000. The fair market value in the summer of 2006 was $30,612, leaving a damage of $15,388 per lot. There were 99 lots at the time of the breach, but FIG sold six of those. Accordingly the total of FIG's damages on the 93 lots unsold in the second contract is $1,431,084. In addition, it was essentially undisputed that FIG would not have made the note to the Bank of Goochland but for the Jesse's Ridge agreement and FIG has incurred definite expenses of carrying the loan. This amount is a foreseeable consequence of the breach by Prospect and is recoverable by FIG.

FIG has also requested prejudgment interest pursuant to Virginia Code § 8.01-382. A purpose of the statute is to place the prevailing plaintiff in the position it would have occupied absent the breach. *Marks v. Sanzo*, 231 Va. 350, 356, 345 S.E.2d 263 (1986). In this case, FIG's request for prejudgment interest is denied because this dispute has taken more than two years to progress from the date of filing until the trial. It would be unfair to award prejudgment interest from September 1, 2006, until entry of the judgment where the prevailing plaintiff participated in the delay. During some of that time, FIG was obtaining permits that were overdue. Interest should accrue at the legal rate from the date of judgment until paid.

Mr. Bayliss should prepare the Order granting Judgment to Plaintiff for two claims of breach of contract and dismissing the Counterclaim.