**EDEN HANNON & COMPANY,**
**Plaintiff–Appellant,**

v.

**SUMITOMO TRUST & BANKING COMPANY, Defendant–Appellee.**

**EDEN HANNON & COMPANY,**
**Plaintiff–Appellee,**

v.

**SUMITOMO TRUST & BANKING COMPANY, Defendant–Appellant.**

Nos. 89–2201, 89–2208.

United States Court of Appeals,
Fourth Circuit.

Argued July 18, 1990.

Decided Sept. 19, 1990.

As Amended Oct. 12, 1990.

Rehearing and Rehearing In Banc
Denied Nov. 6, 1990.

Ralph N. Albright, Jr. (argued), Peter Buscemi, Brian B. Darville (on brief), Morgan, Lewis & Bockius, Washington, D.C., for appellant.

John Vanderstar (argued), John C. Richowsky (on brief), Covington & Burling, Washington, D.C., for appellee.

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

Eden Hannon & Co. ("EHC") is an investment company located in Alexandria, Virginia, and Sumitomo Trust & Banking Co. is a New York subsidiary of a Japanese bank. This appeal involves the competition between EHC and Sumitomo to purchase an investment portfolio from Xerox Corporation. In the past, EHC has produced extensive economic models for the purpose of valuing Xerox lease portfolios, bidding on these portfolios, and selling the income rights to the portfolios to institutional investors. In the late summer of 1988, Sumitomo indicated interest in purchasing a portfolio through EHC. To that end, Sumitomo signed a "Nondisclosure and Noncircumvention" agreement with EHC, in order to protect the confidential information that EHC later shared with Sumitomo. In violation of that agreement, and after taking possession of EHC's confidential analyses, Sumitomo bid on the December 1988 Xerox portfolio, won the bid, and made a direct purchase of the portfolio. EHC had bid also on that portfolio, and its bid was ranked third by Xerox officials.

EHC subsequently filed this suit, stating four counts: misappropriation of trade secrets, breach of contract, breach of fiduciary duty, and breach of the duty of good faith and fair dealing. Sumitomo denied these allegations, and filed a counterclaim which primarily asserted that EHC's complaint was a sham suit and an attempt at monopolization in violation of the Sherman Act, 15 U.S.C. § 2. The four counts in the counterclaim (as amended) were monopolization, attempted monopolization, breach of duty of good faith and fair dealing, and interference with prospective business relations. Both parties' counts alleging a breach of the covenant of good faith and fair dealing were eliminated prior to trial, and they are not raised in this appeal. At trial, at the close of plaintiff EHC's case, the district judge, satisfied that the case was not a sham, dismissed the remainder of Sumitomo's counterclaim. The district judge also struck EHC's claim for monetary damages at that point. He held that since EHC's bid was ranked third by Xerox, EHC had not proven monetary damage from Sumitomo's bidding with sufficient certainty, because it was most likely that the second place bidder would have won the portfolio in that instance. Since EHC's request for an injunction was the only claim for relief remaining, the district judge dismissed the jury, and the trial continued on EHC's complaint. After hearing all of the evidence, the judge found that Sumitomo's actions constituted a breach of contract, and found that a misappropriation of trade secrets had not been proven. It is unclear as to whether the judge found that a breach of fiduciary duty had taken place. However, our decision does not depend on the resolution of that count.

As a remedy, the district judge enjoined Sumitomo from repeating its violation of the Noncircumvention and Nondisclosure Agreement. Both parties have appealed

the rulings adverse to their positions, and we affirm in part, reverse in part, and remand.[1] Most importantly, we find that EHC is entitled to a constructive trust on Sumitomo's profits from the portfolio purchase as an equitable remedy for their breach of the agreement. We also find that the district judge was not clearly erroneous in dismissing Sumitomo's claim that this suit was a sham.

## I.

The "portfolio" that Xerox sells is composed of the right to receive the stream of income from a group of copiers leased by Xerox, and to receive the residual value of the copiers when the leases expire or are terminated. This is known as the Xerox Partnership Asset Strategy ("PAS") Program. Four times a year, Xerox invites a limited number of investors to bid for a portfolio, which typically contains several hundred copiers leased by Xerox to various customers for terms usually ranging from one to three years. EHC has been a regular bidder and frequent winner in the past, winning ten quarterly bids in the first three-and-a-half years of the program. The bids submitted to Xerox are not just dollar figures; instead, a bid consists of several components, and each component addresses how an element of the projected revenue stream would be divided between Xerox and the successful bidder.

EHC does not bid with its own money in these sales. Instead, it arranges in advance for a bank or insurance company to provide the monetary investment, and in return that investor receives all of the revenue generated by the leases. The investor takes a security interest in the equipment and leases purchased, and agrees to look only to that security in the event of a default. EHC makes a profit by charging the investor a certain percentage over the portfolio's purchase price, and thus after paying back the entire return on the portfolio to the investor, it generates its own margin in the mark-up. For example, EHC would often charge the investor 101.5% of the portfolio purchase price, pass on all of the income received, and achieve a margin of 1.5%. Hence, EHC does not make money by investing in these portfolios; it makes money by selling its expertise in valuing portfolios to institutional investors.

Given that EHC's value is in its knowledge, it must guard that knowledge jealously. On the other hand, it must also disclose a great amount of its confidential analysis regarding a proposed bid on a portfolio in order to convince an institution to bid from $25 million to more than $60 million on a single portfolio. To that end, EHC requires any interested investor to sign a "Nondisclosure and Noncircumvention Agreement" (an "Agreement") before it can receive any of EHC's confidential information. This Agreement requires that the investor not disclose the information it receives from EHC to other parties. Most importantly, it also requires that the potential investor "not independently pursue lease transactions" with Xerox's PAS Program "for a period equal to the term of the Purchase Agreement." Since the copiers are usually leased for one to three years, we presume that this term would prevent an investor from independently pursuing a portfolio for approximately three years.

Sumitomo was a potential investor interested in the PAS portfolio. Immediately after EHC won the June 1988 portfolio bid, a Sumitomo officer, Ragheed Shanti, based in the United States, telephoned EHC to express interest. In order to evaluate the PAS program, Shanti attempted to obtain EHC's economic data on their winning June bid. EHC insisted that it could not disclose that information without an Agreement signed by a Sumitomo representative. Shanti tried to avoid signing an Agreement, and then attempted to water down the provision that would require Sumitomo not to "independently pursue" portfolio purchases. Shanti proposed to delete that provision, and substitute language that

---

1. On July 13, 1990, EHC made a motion to this court to add plaintiff's exhibits 11 and 12 to the appeals appendix. That motion is granted, and we have considered that information in this opinion.

would require (1) that Sumitomo would notify EHC if it decided to pursue lease transactions on its own, and (2) that it could not use EHC's confidential information if it decided to bid. EHC refused this substitution, and Shanti eventually signed the original Agreement on the part of Sumitomo. During these negotiations over the language of the Agreement, Sumitomo admitted to EHC that it was also considering financing a portfolio bid by a competitor of EHC, DPF Leasing Services, Inc. ("DPF"). EHC indicated that the Agreement would not prevent Sumitomo from financing a competitor's bid. However, EHC did not want to create a new competitor that would use EHC's information to bid directly against it. Thus, the understanding between EHC and Sumitomo was that Sumitomo could finance a competitor's bid, but it could not directly bid (*i.e.*, "independently pursue") on a portfolio during the "term of the Purchase Agreement."

Once the Agreement was signed, EHC disclosed a great amount of confidential bidding information to Sumitomo: confidential information regarding the June bid, how the bid had been prepared, what EHC's bidding strategy had been, a comparison of past portfolio performance in relation to bid price, how EHC's economic model worked, the language used in each element of the successful June bid, and how EHC sculpts its bids. In addition to this written material, EHC also gave Shanti an extensive oral presentation, which lasted over two hours, and in which Shanti asked many questions. However, Sumitomo and EHC could not reach a deal on a bid for the next portfolio to be offered in December, 1988. Sumitomo's proposed interest rate was considerably higher than EHC was willing to consider.

This did not prevent Sumitomo from participating in the bidding for the December portfolio, however. In fact, Sumitomo bid directly on the portfolio, in clear violation of the Agreement with EHC. At trial and in this appeal, Sumitomo has claimed that it only invested in a portfolio that was won by a competitor of EHC. However, this proposition was rejected below, and we reject it also. In submitting its bid, Sumito-

mo worked through Gerry Sherman, who was a former employee of DPF, a competitor of EHC. Sherman had formed his own one-man company, Oasis, which would work on bids for Xerox PAS portfolios. Sherman had experience from his days at DPF in the economic modelling and bidding process for such portfolios. Sumitomo argues that Oasis won the December bid by carrying out the same functions as EHC would have carried out.

This is not true. To us, and to the district court, it is clear that Oasis was merely a stalking horse for Sumitomo, and that Sumitomo was the direct bidder for the December portfolio. Well before the December bid, Sumitomo documents indicated that it was interested in cutting out the middle-man leasing companies and bidding directly on portfolios. Sumitomo noted that because its cost of funds would be cheaper, it could realize a "huge profit." A Sumitomo "contact report" submitted at the end of November 1988, indicates that Sumitomo officials visited the Xerox plant in Rochester (New York, presumably) to view the equipment that would be bid on in the December portfolio. That report indicates that Sumitomo was being invited to participate directly in the bidding process, and that it was important for this information to be kept confidential, so that "no other party knows the role that STB [Sumitomo] is playing." In a later confidential internal report to other bank officials, Shanti crowed about the financial advantages that a bank would have in competing directly with leasing companies for portfolios. In that same report, Shanti indicated that the bid would have to be made through "a Shell company to avoid having damage to the relationship with ... Eden Hannon." In addition, when Sumitomo's home office in Tokyo was considering Shanti's proposal, it inquired where Shanti had gotten its detailed information on how the competition would bid. Shanti replied that he had obtained information from two Xerox officials and from EHC and Sherman. This is not even the whole of it, for in numerous other documents generated by Shanti for Sumitomo, and in Xerox doc-

uments, it is made clear that Sumitomo was the bidder and purchaser. For example, in a letter to Sumitomo from Sherman (not on Oasis stationary), Sherman demands a fee of .25% of the deal's value in exchange for his "introducing" the Xerox opportunity to Sumitomo and for "expedit[ing] the successful conclusion of these opportunities." Most importantly, regarding the document announcing Sumitomo's bid to Xerox, although it was typed on Oasis stationary and signed by "Jerry (sic) Sherman", the letter describes the bid as "a proposal for a direct purchase by Sumitomo...." Thus, there is no doubt in our minds that Sherman was a mere stalking horse, and that Sumitomo violated its Agreement with EHC by making this bid.

Unfortunately, it is unclear whether Sherman also provided the financial advice to Sumitomo that enabled it to make its bid. Sherman did work on the Xerox PAS Program when he was employed by EHC's competitor, DPF. Sumitomo has claimed that it gained all of its knowledge on how to value and bid for a Xerox portfolio from Sherman. While Sumitomo admits that it had possession of the confidential materials it got from EHC, it claims that did not use these materials *at all*. It states that after negotiations fell through with EHC on August 25, 1988, Shanti put these materials in a box and never looked at them again. In a close call, the district judge found that Sumitomo had not misappropriated EHC's trade secrets, and thus, the district judge must have found Sumitomo's story more credible on this point.

Since our disposition of this case does not depend on knowing whether Sumitomo actually used this information, we will not dwell on the point. However, we have our doubts about the correctness of this finding. Recall that when the Tokyo Office asked Shanti where he was getting his detailed information on the competition, Shanti listed one source as "Eden Hannon." This report was dated December 2, 1988, three months after Shanti supposedly put EHC's materials "back in their box."

Also, are we supposed to believe that Shanti forgot everything that he previously read in EHC's materials, and forgot all of the additional information he received in EHC's oral presentation? This is doubtful.

## II.

■ We find that the district judge was correct in holding that Sumitomo breached its Noncircumvention and Nondisclosure Agreement with EHC. Sumitomo argued in this appeal, as they did below, that they did not "independently pursue" or obtain an interest in the December portfolio, and that they only invested through another outfit (Oasis) performing the same function as EHC. We agree with the district judge that facts do not support this position, and that it "defies logic and common sense." Oasis was merely a stalking horse for Sumitomo's efforts to avoid its obligations under the Agreement. The district judge correctly granted an injunction to prevent another violation of that Agreement in the future. However, EHC was entitled to additional equitable relief—a constructive trust on Sumitomo's illegally gotten gains. This remedy does not depend on proof of actual damage to EHC; instead, it focuses on the wrongful conduct of the violator. In order to explain why this remedy is available, it is necessary to explain the role that the Agreement played in the parties' relationship.[2]

The Supreme Court of Virginia has decided several cases involving agreements not to compete in the employment law arena, and those cases are substantially similar to the case at bar. In many employment contracts, there is language stating that upon termination of the employment relationship, the employee is restricted from competing with the employer within a certain amount of time and within a certain geographical area (for the purposes of this opinion, these are called "employment agreements"). The Virginia courts have held repeatedly that employment agreements are enforceable if they pass a three-part reasonableness test:

---

**2.** This case is controlled by Virginia law, and we have not found a Virginia case that addresses this type of situation. However, we are not without guidance from Virginia.

(1) Is the restraint, from the standpoint of the employer, reasonable in the sense that it is no greater than is necessary to protect the employer in some legitimate business interest?

(2) From the standpoint of the employee, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing his legitimate efforts to earn a livelihood?

(3) Is the restraint reasonable from the standpoint of sound public policy?

*Paramount Termite Control Co. v. Rector*, 238 Va. 171, 380 S.E.2d 922, 924 (1989) (citations omitted). The agreements that pass this test may be enforced in equity.

The Noncircumvention and Nondisclosure Agreement (in the forthcoming discussion, we will call this a "noncircumvention agreement") is nearly identical in purpose to an employment agreement. Most importantly, an employment agreement enables an employer to expose his employees to the firm's trade secrets. Similarly, a noncircumvention agreement enables potential joint venturers to share confidential information regarding a possible deal. In both instances, the idea is to share trade secrets so that business can be conducted without losing control over the secrets. Often, the value of a firm is its special knowledge, and this knowledge may not be an idea protectible by patent or copyright. If that firm cannot protect that knowledge from immediate dissemination to competitors, it may not be able to reap the benefits from the time and money invested in building that knowledge. If firms are not permitted to construct a reasonable legal mechanism to protect that knowledge, then the incentive to engage in the building of such knowledge will be greatly reduced. Free riders will capture this information at little or no cost and produce a product cheaper than the firm which created the knowledge, because it will not have to carry the costs of creating that knowledge in its pricing. Faced with this free rider problem, this information may not be created, and thus everybody loses. To counteract that problem, an employer can demand that employees sign an employment agreement as a condition of their contract, and thus protect the confidential information. This means that if an employer takes in an employee and exposes that employee to trade secrets, the employer does not have to allow the employee to go across the street and set up shop once that employee has mastered the information. Although it was not explained in this detail, Virginia has recognized this interest in protecting confidential information. *Paramount*, 380 S.E.2d at 925.

These employment agreements (or in the present case, a noncircumvention agreement) are often necessary because it can be very difficult to prove the theft of a trade secret by a former employee. Often, the purpose of an employment agreement can be to prevent the dissemination of trade secrets, yet a mere ban on using trade secrets after the termination of employment would be difficult to enforce. Judge Lord explained the problem well in *Greenberg v. Croydon Plastics Co.*, 378 F.Supp. 806, 814 (E.D.Pa.1974):

> Plaintiffs in trade secret cases, who must prove by a fair preponderance of the evidence disclosure to third parties and use of the trade secret by the third parties, are confronted with an extraordinarily difficult task. Misappropriation and misuse can rarely be proved by convincing direct evidence. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what the plaintiffs allege happened did in fact take place. Against this often delicate construct of circumstantial evidence there frequently must be balanced defendants' witnesses who directly deny everything.

Actually, Judge Lord's description of the problem covers just the tip of the iceberg. There are several problems with trying to prevent former employees from illegally using the former employer's trade secrets, and these problems are caused by the status of the law regarding the misappropriation of trade secrets. First, as Judge Lord depicted so well, it is difficult to prove that the trade secret was actually used. Sec-

ond, the former employee tends to get "one free bite" at the trade secret. Most courts will refuse to enjoin the disclosure or use of a trade secret until its illegal use is imminent or until it has already occurred. By that time, much of the damage may be done. Third, even if a clearly illegal use of the trade secret by a former employee can be shown, most courts will not enjoin that person from working for the competition on that basis. Instead, they will merely enjoin future disclosure of the trade secret. Yet, policing the former employee's compliance with that injunction will be difficult. Finally, even if the employee does not maliciously attempt to use his former employer's trade secrets in the new employer's workplace, avoiding this use can be difficult. It would be difficult for the employee to guard the trade secret of the former employer and be effective for the new employer. M. J. Hutter, *Drafting Enforceable Employee Non–Competition Agreements To Protect Confidential Business Information: A Lawyer's Practical Approach To The Case Law*, 45 Albany L.Rev. 311, 314–16 (1981). *See also* Milgram, *Trade Secrets* § 7.07[1][a], at 7–184 (1989).

In order to avoid these problems, many employers ask their employees to sign non-competition agreements. These agreements prevent an employee from working with the competition within a limited geographical range of the former employer and for a limited time. As seen above, Virginia courts will only enforce these agreements if they are reasonable. Yet, when they are valid, they make the guarding of a trade secret easier since they remove the opportunity for the former employee to pass on the trade secret to the competition, either malevolently or benevolently. This does not supplant the need for law protecting trade secrets. Non-competition agreements cannot prevent disclosure anywhere in the world and until the end of time, for they would be held unreasonable. Instead, a non-competition agreement will merely prevent the illegal use of a trade secret next door in the near future, where the use might do the most damage.

EHC's position regarding potential investors was the same as an employer-employee relationship in regard to the use of trade secrets. The thing that made EHC valuable was its expertise in valuing lease portfolios. EHC would "sell" its knowledge of the value of a particular PAS portfolio to investors for a percentage of the profit. It was necessary for EHC to share its confidential economic models and projections on the particular bid in order to attract investors. Yet, if it gave this information to an investor without restriction, that investor would merely make the bid directly and cut EHC out of the deal, after EHC's investment in expertise and research made the bid possible.

EHC could have merely prohibited its potential customers from using its information if that customer became a rival bidder. Indeed, this was the essence of Shanti's counterproposal regarding the language of the agreement, which was rejected by EHC. Such an arrangement would have become an unenforceable honor system. In the present case, Sumitomo has denied that it used the materials it received from EHC, and claimed that it gained its expertise primarily from Gerry Sherman. The trial judge ultimately ruled that there had not been a misappropriation of trade secrets, but his ruling was based on Sumitomo's denials and the citing of Sherman's experience in the area. The trial court did not definitively discover whether Sumitomo actually used these materials, and there was no way that it could have found out. For that reason, EHC chose to include in its agreement with potential investors the noncircumvention clause. Armed with that agreement, EHC could protect its information by merely showing that an investor was competing contrary to the agreement, without having to prove that it was actually using EHC's confidential information.

Virginia courts have also recognized that firms have a legitimate interest in protecting their customer contacts. *Paramount*, 380 S.E.2d at 925. In *Paramount*, the court found that a termite extermination company could legitimately restrict its employees from going to work for a rival

company in any county of Virginia where employees had worked, for two years after the termination of their employment. The court found that these restrictions are permissible when they reasonably take into account the need of the employee to make a living, and if they do not impair the competitive nature of the industry in question. *Id.* In so ruling, the Virginia court implicitly recognized the investment that a firm has in its customer lists. It can require a great deal of time and personal contact to build a solid base of clients. If your sales representatives are free to leave the firm and try to take these clients along at any minute, this investment can be undermined and thus discouraged. An employment agreement that restricts this activity for a reasonable length of time and within a reasonable geographical reach can protect this investment while not harming competition in an industry with many competitors.

EHC had such legitimate interests in this case. One reason why it had a noncircumvention clause was to prevent its disclosures from creating new competitors. The competition for the PAS portfolios was already keen. Xerox invited a limited number of businesses to bid for the portfolios, and there were many other businesses who wanted a chance to bid that were seeking invitations. EHC had a legitimate fear that it would let a new bidder through the door if it educated that investor and gave it contacts to Xerox. Thus a reasonable noncircumvention clause was constructed to place a reasonable limit on competition from a temporary ally.

Thus, EHC's noncircumvention agreement is merely a twist on employment noncompetition agreements that have been recognized by the Virginia courts. That being so, we will briefly discuss the application of Virginia's three-factor test for reasonableness to the case at bar. We have reworked the terms of the test so that it will address noncircumvention agreements.

1. Is the restraint on circumvention no broader than is necessary, from the standpoint of the trade secret holder, to protect the holder from the disclosure of its confidential information? Yes. The limitation provided by the noncircumvention clause did not prevent Sumitomo from doing many things. Sumitomo could still invest in a bid won by a competitor of EHC; it could use this information internally in order to put together its own bid for lease portfolios offered by companies other than Xerox; and Sumitomo could bid directly for PAS portfolios in approximately three or four years after the Agreement was signed. This was a narrowly drawn limitation.

2. From the standpoint of the party that received the confidential information, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing the legitimate efforts of that party to conduct its business? Yes. Most importantly, Sumitomo could still invest immediately in any winning bids, including EHC's competitors. Also, Sumitomo could bid directly on any other lease program other than Xerox's, and it could directly invest in Xerox's PAS Program after several years. Furthermore, presumably Sumitomo can make (and has made) money in its other banking activities.

3. Is the restraint reasonable from the standpoint of sound public policy? Yes. This factor overlaps the area covered by the first two factors to a great extent. Presumably, public policy seeks to protect the development of trade secrets without ruining competition or driving the receiver of confidential information out of business. As discussed above, this noncircumvention agreement satisfies those concerns. EHC's economic modeling process receives some protection, the bidding for Xerox PAS portfolios remains highly competitive, and Sumitomo will certainly remain a profitable bank.

### III.

Now we turn to the appropriate remedy. Equitable remedies are available in Virginia to address the harm visited by a violation of noncompetition agreements. For example, Virginia courts have permitted the use of injunctions to prevent the violation of noncompetition agreements.

*See Paramount, supra; Roanoke Engineering Sales Co. v. Rosenbaum,* 223 Va. 548, 290 S.E.2d 882 (1982). The Virginia courts have also adopted a policy of great flexibility in fashioning appropriate equitable remedies to address the violation of noncompetition agreements:

> In the administration of remedies, an equity court is not bound by the strict rules of the common law, but adapts its relief and molds its decrees to satisfy the requirements of the case. Its purpose is the accomplishment of justice, and it will administer such relief as the exigencies of the case demand. The absence of precedents, or novelty in incident, presents no obstacle to the exercise of jurisdiction.
>
> "Equitable remedies ... are distinguished by their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use. There is in fact no limit to their variety and application; the court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties."

*Roanoke Engineering,* 290 S.E.2d at 886 (citations omitted), *quoting First Nat'l Bank v. Hughson,* 194 Va. 736, 753–54, 74 S.E.2d 797, 809 (1953) (Buchanan, J., concurring).

Virginia courts will often turn to equitable remedies when money damages are speculative, and this is one of those instances. In addition, an equitable remedy does not preclude a monetary award. *See* 7A M.J., *Equity,* § 10 (1985, 1989 Supp.) A constructive trust (which can also be called an accounting in this instance) is appropriate in the case at bar. It is very difficult to prove the actual damage caused by the theft of a trade secret. *See Greenberg,* 378 F.Supp. at 806, and authorities cited therein. In that case, a constructive trust will serve a two-fold remedial interest; it will force the transgressor to forfeit the illegally-gotten gains, and provide compensation for the plaintiff's injury. *Id.* For example, in *Greenberg,* the court ordered an accounting of the profits earned by the former employee. It was uncertain how much of the sales of the flavored mouthpiece by the former employee's new company had hurt the sales of the former company. It was far easier to determine the amount of profit earned by the party that misappropriated the trade secret. *Id.*

A similar problem arises in the case at bar. It is difficult to determine the extent of EHC's loss, and far easier to determine the extent of Sumitomo's benefit from the breach of the Agreement. For example, we do not know if EHC would have won the bidding for the December portfolio had Sumitomo not submitted a bid. The record establishes that EHC's bid was ranked third by Xerox officials, behind Sumitomo's and one other. Although the record does not supply much detail on the issue, it does indicate that Xerox did not always award the contract to the highest ranked bidder. Furthermore, given EHC's success in bidding for past portfolios, its chances of succeeding may have been quite good; it is impossible to say definitively. It should be far easier to determine Sumitomo's profits from the breach of the noncircumvention agreement.

### IV.

Sumitomo has also appealed the dismissal of its antitrust claims. This issue does not give us great pause. Sumitomo claimed that this suit was brought solely for the purpose of harassing Sumitomo, and by harassing competitors, to monopolize the market for PAS portfolio purchases. As an aside, we doubt that this is the relevant product market definition, since there must be a high cross elasticity of demand between the Xerox PAS portfolio and other lease purchase portfolios. Regardless, Sumitomo loses. Under the *Noerr–Pennington* doctrine,[3] the filing of a lawsuit (or the seeking of other government action) can only violate antitrust laws

---

3. *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor* *Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

when it is a "sham." Since EHC has succeeded in its breach of contract claim and won a constructive trust and an injunction, this suit is hardly a sham. Sumitomo then argues that regardless of merit, a suit can be a sham if it was brought for the *purpose* of being a sham. This cannot be so. If a litigant can persuade a neutral judge or jury that it is entitled to legal relief from the conduct of another based upon the law and facts, that suit cannot be a sham under the *Noerr–Pennington* doctrine. Intent only becomes relevant once the invalidity of the legal claims is established. *See Hospital Building Co. v. Trustees of Rex Hospital*, 791 F.2d 288, 292–93 (4th Cir.1986) (addresses the role of intent in sham litigation).

### V.

Accordingly, we affirm in part, reverse in part, and remand this case for further treatment. None of the rulings as to any of the counts needs to be reconsidered. However, EHC is entitled to a constructive trust over Sumitomo's profits from the purchase of the December 1988 Xerox PAS portfolio. Thus, the district court should determine the amount of Sumitomo's profits on that portfolio, and enter an order awarding that amount to EHC.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.