Biesse Am., Inc. v. Dominici, 2019 NCBC 50.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

BIESSE AMERICA, INC.,

           Plaintiff,

v.

LAURO DOMINICI and SCM
GROUP NORTH AMERICA, INC.,

           Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 15033

**ORDER AND OPINION ON MOTION
FOR PRELIMINARY INJUNCTION**

1.     This case presents a familiar fact pattern. Lauro Dominici, a defendant here, worked for Biesse America, Inc., the plaintiff, for nearly three years. Upset over a salary dispute, Dominici resigned and accepted new employment with SCM Group North America, Inc. ("SCM America"), also a defendant and one of Biesse America's direct competitors. Biesse America contends that, by doing so, Dominici breached a non-compete provision and other restrictive covenants in his employment agreement. It further contends that, just before resigning, Dominici gathered electronic documents containing trade secrets, took them when he left, and planned to use them on behalf of his new employer.

2.     Upon filing its complaint, Biesse America sought a temporary restraining order enjoining Dominici's employment with SCM America and directing Dominici to return any trade-secret and confidential materials. (ECF Nos. 3, 5.) On July 30, 2019, the Court granted the request and now, with the benefit of full briefing and a complete record, must decide whether to enter a preliminary injunction through the pendency of this action. (*See* TRO, ECF No. 13; Mot. for Prelim. Inj., ECF No. 15.)

For the reasons discussed below, the Court concludes that a preliminary injunction is warranted, though not to the extent urged by Biesse America. The Court therefore **GRANTS** in part and **DENIES** in part the motion for preliminary injunction.

> *James, McElroy & Diehl, P.A., by Adam L. Horner and Christopher T. Hood, for Plaintiff Biesse America, Inc.*
>
> *Bray & Long, PLLC, by Jeffrey A. Long, for Defendant Lauro Dominici.*
>
> *Bell, Davis & Pitt, P.A., by Edward B. Davis, and Miller & Martin, PLLC, by Ryan A. Kurtz, for Defendant SCM Group North America, Inc.*

Conrad, Judge.

## I.
## FINDINGS OF FACT

3. The Court makes the following findings of fact solely for the purpose of deciding the pending motion. These findings are not binding at a trial on the merits. *See Lohrmann v. Iredell Mem'l Hosp., Inc.*, 174 N.C. App. 63, 75, 620 S.E.2d 258, 265 (2005).

4. Biesse America is a North Carolina corporation in the field of wood-, stone-, and glass-working. (V. Compl. ¶¶ 1, 8.) Its business is to import, sell, and service machinery and products manufactured by its Italian parent, Biesse S.p.A. (V. Compl. ¶¶ 8, 9; Br. Opp'n Mot. Prelim. Inj. Ex. 1 ¶ 6, ECF No. 29.1 ["Dominici Aff."].) Biesse America's operations are limited to the United States and Canada; Biesse S.p.A., however, has a presence in more than 100 countries worldwide. (*See* Dominici Aff. ¶¶ 5, 23; Br. Opp'n Mot. Prelim. Inj. Ex. 2.)

5. Dominici, a native of Italy, got his start with Biesse S.p.A. in 2008. (Dominici Aff. ¶ 7.) After eight years and a handful of promotions, Dominici moved to North Carolina to take a new position with Biesse America. (Dominici Aff. ¶¶ 7,

10, 11.) In July 2016, he signed an employment agreement and began work in Biesse America's wood division, with particular responsibility for woodworking machines known as edgebanders. (Dominici Aff. ¶¶ 12, 13, 16, 17.) There is some ambiguity about Dominici's official title—the employment agreement refers to "Regional Area Manager" while Dominici refers to himself as "Product Area Manager"—but there is no dispute that he was responsible for a territory covering thirty-eight States and Canada. (*See* V. Compl. Ex. A Annex 1 ["Empl. Agr."]; Dominici Aff. ¶ 14.) Among other things, Dominici provided technical support to sales staff and assisted with managing customer relationships. (*See* Dominici Aff. ¶¶ 19, 20.)

6. The employment agreement includes a series of restrictive covenants. Central to this dispute is the non-compete provision in Article 17, which provides as follows:

> Employee acknowledges that the Corporation is engaged in a business that is international in scope. In the event that either the Corporation or the Employee terminates the employment for any reason, the Employee covenants and agrees that, except with the prior written consent of the Corporation, he will not, for a period of six (6) months from and after the date of termination of the Employee's employment, accept a competitive position in a competitive company that is in the wood, stone, glass working and/or plastic industries and in direct competition with Biesse America, Inc. or Biesse SpA that is conducting business in the same markets as the Corporation within the six (6) months period immediately preceding the effective date of the termination of the Employee's employment with the Corporation . . . . It is acknowledged and agreed that the following list of companies includes, but does not necessarily limit, those companies in direct competition with the Corporation: . . . SCM . . . .

(Empl. Agr. § 17(a).) (The agreement defines "Corporation" to mean Biesse America. (Empl. Agr. 1.)) In the event of a breach of the non-compete, "the period of restriction

shall begin to run in full from the date that Employee's competition is enjoined by a court or otherwise ceases." (Empl. Agr. § 17(c).) Other provisions prohibit Dominici from soliciting Biesse America's customers, restrict his use and disclosure of its confidential information, and require him to return its records and property at the end of his employment. (Empl. Agr. § 11, 15(b), 16.)

7. A salary dispute led to a rift in May 2019. Biesse America informed Dominici that it was planning to change its commission structure. (*See* Dominici Aff. ¶ 30; Aff. Jason Varelli ¶ 10, ECF No. 30.1 ["Varelli Aff."].) Dominici objected on the ground that the change ran afoul of Annex 4 to the employment agreement, in which Biesse America reserved "the right to re-negotiate" the commission structure "for the following year to a different value when the total commission earnings for the current year reach $80,000." (Empl. Agr. Annex 4 § 1(c); *see also* Dominici Aff. ¶ 27; Varelli Aff. Ex. A.) Dominici's commission earnings for 2018 had fallen just shy of that mark. (Dominici Aff. ¶ 28, Ex. B.) Believing the new structure would cut his commissions for 2019 in half, he immediately proposed a counteroffer. (*See* Dominici Aff. ¶¶ 31, 32; Varelli Aff. ¶ 11, Ex. A.)

8. At the same time, Dominici began looking for a new job. He contacted an employee of SCM America. (Dominici Aff. ¶ 36; V. Compl. ¶ 22.) On May 6, 2019, Dominici received a call from SCM America's chief executive officer, which led to an in-person meeting in the next week or so. (Dominici Aff. ¶¶ 37–40.) An offer followed (when is unclear), and on June 12, Dominici signed an agreement to begin employment with SCM America on July 15. (Dominici Aff. ¶ 44.)

9.     Much of this case turns on Dominici's actions between his meeting with SCM America's representatives and his acceptance of employment there.  On May 24, for example, Dominici met with Elizabeth Valentin in Biesse America's human resources department to discuss his compensation.  (Dominici Aff. ¶ 42; Aff. Elizabeth Valentin ¶ 5 ["Valentin Aff."].)  The accounts of that meeting differ, but in later e-mail correspondence, Dominici floated the idea that he might resign or be fired.  (*See* Valentin Aff. Ex. A.)  Dominici sought to confirm that his existing commission structure would remain in place "[f]or example if our relationship would end in June." (Valentin Aff. Ex. A.)  Valentin agreed that it would.  (*See* Valentin Aff. Ex. A.)

10.     When June arrived, Dominici began making unusual requests for documents containing Biesse America's confidential information.  (*See* Dominici Aff. ¶ 72.)  First, Dominici requested and received all of the purchase order forms ("MTOs") for Biesse America's CNC products—a product line outside of Dominici's area of responsibility.  (*See* Dominici Aff. ¶ 80; Aff. Andrew De Piante ¶¶ 2, 4, ECF No. 8.)  These MTOs contain Biesse America's confidential pricing and technical information.   (Aff. Niki Kaltsounis-Kampiziones ¶¶ 3(i)–(k), ECF No. 9 ["1st Kaltsounis-Kampiziones Aff."].)  Dominici also requested and received the factory global list prices for each machine model and the final discounts that Biesse America had negotiated with its supplier ("Discount File") as well as the price markups that Biesse America applied to each product and used to calculate the final customer list price ("Markup File").   (Aff. Andrea DiCara ¶¶ 2, 3, ECF No. 7; 1st Kaltsounis-

Kampiziones Aff. ¶¶ 3(e)–(h).)  Dominici saved these electronic files to his personal computer, which he regularly used for work purposes.  (*See* Dominici Aff. ¶ 59.)

11.  On June 12, the same day he accepted employment with SCM America, Dominici gave 30-day notice of his intent to resign from Biesse America, though he did not share the identity of his new employer.  (*See* Dominici Aff. Ex. C.)  A week later, Biesse America informed Dominici that June 18 had been his last day with the company.  (*See* Dominici Aff. ¶ 45; V. Compl. Ex. B.)  In that same letter, Biesse America reminded Dominici of the restrictive covenants in his employment agreement and asked him to return all company property, including devices and electronic files.  (*See* V. Compl. Ex. B.)  Despite this request, Dominici kept the work materials—including the MTOs, the Discount File, and the Markup File—stored on his personal computer.  (*See* Dominici Aff. ¶ 70.)

12.  Visa complications prevented Dominici from beginning work for SCM America immediately.  (*See* Dominici Aff. ¶ 51.)  Nevertheless, in mid-July, he attended an industry trade show in Las Vegas, where he staffed SCM America's booth and wore its branded lanyard.  (Dominici Aff. ¶¶ 52, 53; 1st Kaltsounis-Kampiziones Aff. ¶ 3(a).)  Employees of Biesse America saw Dominici and confronted him about his non-compete.  (*See* 1st Kaltsounis-Kampiziones Aff. ¶¶ 3(a), (b).)

13.  Dominici later retained counsel and responded that the non-compete was unenforceable.  (*See* Dominici Aff. Ex. F.)  Dominici also offered to move to the west coast and not to compete against Biesse America in the territory he covered during his employment there.  (*See* Dominici Aff. Ex. F.)  Dominici's agreement with SCM

America dubs him the "Area Manager of the North West" for six States in the Pacific Northwest and "High End Edgebander Product Specialist" for the United States, Canada, and Mexico. (*See* Dominici Aff. ¶¶ 47, 49; Dominici Aff. Ex. D § 1 ["SCM Agr."].)

14. After learning that Dominici was working for SCM America, Biesse America began investigating the circumstances of his departure. The investigation revealed Dominici's interest in the MTOs, the Discount File, and the Markup File. (*See* 1st Kaltsounis-Kampiziones Aff. ¶ 3(d).) Biesse America also discovered a voicemail on Dominici's company cell phone, which revealed that he had been communicating with SCM America since early May. (*See* 1st Kaltsounis-Kampiziones Aff. ¶ 3(q).) Biesse America filed this lawsuit shortly thereafter.

15. At the hearing on Biesse America's motion for a temporary restraining order, Dominici's counsel acknowledged that Dominici still possessed the MTOs, the Discount File, and the Markup File and agreed that they should be returned. The Court entered a temporary restraining order and directed Dominici to return those three files and any other confidential information of Biesse America in his possession. (TRO ¶ 18(c).) With the help of a forensic consultant, Dominici retrieved thousands of electronic files and provided them to Biesse America. (*See* Dominici Aff. ¶¶ 93, 95; Aff. Jeffery A. Long ¶¶ 8–15, ECF No. 25.) Among the documents returned were engineering files, price lists, and technical comparisons of Biesse America's products with those of its competitors. (*See* 2d Aff. Niki Kaltsounis-Kampiziones ¶ 3 ["2d Kaltsounis-Kampiziones Aff."].)

16.     Dominici's production also included a series of spreadsheets that he created on the eve of submitting his resignation. On June 11, the day before he resigned, Dominici created a spreadsheet ("Masterfile") containing Biesse America's stock inventory and sales prices. (*See* 2d Kaltsounis-Kampiziones Aff. ¶¶ 6, 7.) Due to its sensitivity, this information cannot be downloaded by Biesse America's employees. (*See* 2d Kaltsounis-Kampiziones Aff. ¶ 7.) Dominici instead copied the information into his own spreadsheet. (*See* 2d Kaltsounis-Kampiziones Aff. ¶ 7.) Metadata shows that Dominici accessed and modified the Masterfile on July 16, 2019—nearly a month after leaving Biesse America and also one day after his employment with SCM America was set to begin. (*See* 2d Kaltsounis-Kampiziones Aff. ¶ 6.)

17.     On June 12, the day Dominici gave notice of his resignation, he created another spreadsheet entitled "Tony Slaven Opportunities.xlsx" ("Opportunities Spreadsheet"). (*See* 2d Kaltsounis-Kampiziones Aff. ¶ 4(e).) The Opportunities Spreadsheet includes dozens of Biesse America's current business opportunities in the Pacific Northwest, which is Dominici's anticipated area of responsibility for SCM America. (*See* 2d Kaltsounis-Kampiziones Aff. ¶ 4(e).) The information, all from Biesse America's confidential customer information database, includes not only the customer name and contact information but also the relevant product, price, and confidence level attributed by Biesse America for each opportunity. (*See* 2d Kaltsounis-Kampiziones Aff. Ex. 2.) Weeks later, Dominici accessed the Opportunities Spreadsheet and divided it into eight new spreadsheets, broken down by product type. (*See* 2d Kaltsounis-Kampiziones Aff. ¶¶ 4(f)–(h), Ex. 2A.)

## II.
## CONCLUSIONS OF LAW

18. A preliminary injunction is "an extraordinary measure taken by a court to preserve the status quo of the parties during litigation." *Ridge Cmty. Inv'rs, Inc. v. Berry*, 293 N.C. 688, 701, 239 S.E.2d 566, 574 (1977). The plaintiff bears the burden to establish the "right to a preliminary injunction," *Pruitt v. Williams*, 288 N.C. 368, 372, 218 S.E.2d 348, 351 (1975), and is entitled to relief only: "(1) if [the] plaintiff is able to show [a] *likelihood* of success on the merits of his case and (2) if [the] plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of [the] plaintiff's rights during the course of litigation." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759–60 (1983) (citation and internal quotation marks omitted). Likelihood of success means a "reasonable likelihood." *Am. Air Filter Co. v. Price*, 2017 NCBC LEXIS 9, at \*11 (N.C. Super. Ct. Feb. 3, 2017) (citing *A.E.P.*, 308 N.C. at 404, 302 S.E.2d at 761).

19. "Injunctive relief is granted only when irreparable injury is real and immediate." *Hall v. City of Morganton*, 268 N.C. 599, 600–01, 151 S.E.2d 201, 202 (1966). The plaintiff may demonstrate irreparable injury by showing "that the injury is one to which the complainant should not be required to submit or the other party permitted to inflict, and is of such continuous and frequent recurrence that no reasonable redress can be had in a court of law." *A.E.P.*, 308 N.C. at 407, 302 S.E.2d at 763 (emphasis omitted). In addition, the trial court must weigh the potential harm a plaintiff will suffer if no injunction is entered against the potential harm to a

defendant if the injunction is entered. *See Williams v. Greene*, 36 N.C. App. 80, 86, 243 S.E.2d 156, 160 (1978).

20. For the reasons discussed below, the Court determines that Biesse America is entitled to a preliminary injunction, but limited to its claim for misappropriation of trade secrets. The Court determines that Biesse America is not entitled to an order enjoining Dominici from competing against Biesse America or soliciting its customers.

A. Unclean Hands

21. Dominici and SCM America contend that that the Court should not reach the merits of the motion for preliminary injunction because Biesse America's request for injunctive relief is barred by its own unclean hands. "[C]ourts have long recognized that a party seeking equitable relief, such as injunctive relief, must come before the court with 'clean hands.' " *Combined Ins. Co. of Am. v. McDonald*, 36 N.C. App. 179, 182–83, 243 S.E.2d 817, 819 (1978).

22. Dominici and SCM America offer two theories. The first is that Biesse America breached Dominici's employment agreement before he resigned and therefore cannot seek to enjoin Dominici for his own breach of that agreement afterward. This issue relates to Dominici's commission earnings. In Annex 4 of the employment agreement, Biesse America reserved the right to renegotiate future commission payments once Dominici's total commissions for a given year exceeded $80,000. Dominici's commissions for 2018 fell short of that mark, and he contends that Biesse America breached the agreement by altering the commission structure

anyway.  (*See* Dominici Aff. ¶¶ 26–32; Br. Opp'n Mot. Prelim. Inj. 7–8, ECF No. 29 ["Opp'n"].)

23.    There is no evidence, though, that Biesse America actually altered the commission structure.  Dominici's supervisor informed him of a proposed change, and Dominici sent an immediate counteroffer.  (*See* Dominici Aff. ¶ 30; Varelli Aff. ¶ 10, Ex. A.)  It is unclear whether any further negotiations took place.  Either way, Biesse America agreed to honor the existing commission structure for 2019.  (*See* Valentin Aff. ¶ 8, Ex. A.)  This evidence is insufficient to show that Biesse America breached the agreement and approached the Court with unclean hands.

24.    The second theory is that Biesse America cannot complain about Dominici's decision to join SCM America because it has also attempted to lure away SCM America's employees in the past.  (*See* Opp'n 8–9, Ex. 7 ¶¶ 6–11.)  But even if Biesse America's conduct in that regard were wrongful, "[a] person is not barred from his day in court in a particular case because he acted wrongfully in another unrelated matter or because he is generally immoral." *Shaw v. Gee*, 2018 NCBC LEXIS 109, at *17 (N.C. Super. Ct. Oct. 19, 2018) (quoting *High v. Parks*, 42 N.C. App. 707, 711, 257 S.E.2d 661, 663 (1979)).  The Court therefore concludes that the doctrine of unclean hands does not bar Biesse America's request for injunctive relief.

### B.  Misappropriation of Trade Secrets

25.    Turning to the merits, the Court first addresses Biesse America's claim for misappropriation of trade secrets.  Dominici and SCM America do not challenge whether the MTOs, the Discount File, or the Markup File are entitled to trade-secret

protection. Nor do they dispute that Dominici kept the files after leaving Biesse America. Instead, they argue that Dominici's activities do not amount to misappropriation and that there is no ongoing risk of harm to Biesse America because all trade-secret and confidential information has been returned. (*See* Opp'n 19–22.)

26. By statute, misappropriation is defined as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent," unless the trade secret was obtained through other legitimate means, such as independent development. N.C.G.S. § 66-152(1). A prima facie case of misappropriation requires substantial evidence that the wrongdoer "(1) [k]nows or should have known of the trade secret; and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." *Id.* § 66-155. A party may rely on direct or circumstantial evidence to prove misappropriation. *See, e.g.*, *TSG Finishing, LLC v. Bollinger*, 238 N.C. App. 586, 595, 767 S.E.2d 870, 878 (2014).

27. The evidence of misappropriation here is compelling. Dominici retained the MTOs, the Markup File, and the Discount File after leaving Biesse America and while intending to work for its direct competitor. (Dominici Aff. ¶¶ 72, 80.) In response to the Court's temporary restraining order, Dominici also identified thousands of other electronic files in his possession that contain Biesse America's confidential information. The documents include non-public price lists, technical descriptions of products, and analyses of competitors' products, among other things. (*See* 2d Kaltsounis-Kampiziones Aff. ¶ 3.) These are precisely the types of valuable

confidential information that North Carolina courts regularly protect as trade secrets. *See, e.g.*, *Red Valve, Inc. v. Titan Valve, Inc.*, 2018 NCBC LEXIS 31, at \*26–28 (N.C. Super. Ct. Apr. 10, 2018) (collecting cases).

28. More troubling, there is evidence showing that Dominici acquired some of this highly sensitive information on the eve of his resignation. On June 11, 2019—the day before Dominici gave notice of his resignation—he created the Masterfile, a spreadsheet containing all of the stock inventory and sales prices for Biesse America and one of its affiliates. (2d Kaltsounis-Kampiziones Aff. ¶¶ 6, 7.) The next day, Dominici gathered information about dozens of current sales opportunities for Biesse America in the Pacific Northwest and put that information into the Opportunities Spreadsheet. (*See* 2d Kaltsounis-Kampiziones Aff. ¶¶ 4(c), (e), Ex. 2A.) The information included customer names, products, and negotiated prices for each opportunity. (*See* 2d Kaltsounis-Kampiziones Aff. ¶ 4(c), Ex. 2.) There is no obvious reason why Dominici would have needed this information to perform his duties for Biesse America; his assigned territory excluded the Pacific Northwest. (*See* Empl. Agr. Annex 1.) But the information had self-evident value for his next job. He had that very day signed an agreement to join SCM America as its "Area Manager of the North West." (Dominici Aff. ¶¶ 44, 49; SCM Agr. § 1; 2d Kaltsounis-Kampiziones Aff. ¶ 5.)[1]

---

[1] This evidence was discovered in the materials produced by Dominici as required by the Court's temporary restraining order and was therefore first introduced in Biesse America's reply brief. The Court gave Dominici's counsel an opportunity to respond at the hearing. As best the Court can tell, Dominici's position is that he never intended to contact these customers but instead identified them so that he would know which customers *not* to contact during his employment with SCM America. Nothing in the record lends credence to this

29.    Dominici and SCM America argue that this evidence shows nothing more than access and opportunity to acquire trade secrets. (*See* Opp'n 20–21.) Not so. All of the relevant files were stored on Dominici's personal devices. He plainly *acquired* them.

30.    And he did so under highly suspicious circumstances. Dominici requested the MTOs, the Discount File, and the Markup File *after* meeting with SCM America to discuss future employment and *after* confirming that Biesse America would pay his full commission earnings "if our relationship would end in June." (Valentin Aff. Ex. A.) He then created the Masterfile and the Opportunities Spreadsheet within hours of announcing his resignation. (2d Kaltsounis-Kampiziones Aff. ¶¶ 4(f), 6, Ex. 2A.) There is ample evidence supporting an inference that Dominici accessed and gathered this confidential information while intending to resign and join a competitor. He also kept the information after resigning and after Biesse America reminded him of his obligation to return its records and related property. (*See* V. Compl. Ex. B.) Taken together, these facts demonstrate Dominici's unauthorized acquisition and retention of the disputed files. *See Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 23, at \*18–19 (N.C. Super. Ct. Mar. 15, 2017) ("[A]n employer may demonstrate unauthorized access by showing that an employee continued to access trade secrets after receiving a job offer from a competitor and then later accepted the offer."); *see also Am. Air Filter*, 2017 NCBC LEXIS 9, at \*24.

---

alleged motive, which is extremely difficult to square with Dominici's acquisition of specific opportunities by product and the pricing information related to those opportunities.

31.     There is also evidence that Dominici *used* the information he acquired.  On July 10, 2019, weeks after leaving Biesse America, Dominici modified the Opportunities Spreadsheet and then used the information within it to create eight new spreadsheets, divided by product type. (2d Kaltsounis-Kampiziones Aff. ¶¶ 4(f)–(h), Ex. 2A.)  He then modified the Masterfile on July 16—the day after his employment was set to begin. (*See* 2d Kaltsounis-Kampiziones Aff. ¶ 6.)  To what end Dominici used the information is unclear, but it coincided with his start date with SCM America and with his attendance of an important trade show on its behalf.

32.     In short, the record as a whole includes substantial evidence that Dominici acquired and used Biesse America's trade secrets without its express or implied consent.  *See* N.C.G.S. § 66-155.  The Court therefore concludes that Biesse America has established a likelihood of success on the merits of its claim for misappropriation of trade secrets.

33.     The Court also concludes that Biesse America would be irreparably harmed in the absence of an order enjoining Dominici and SCM America from using and disclosing its trade secrets.  The Trade Secrets Protection Act "permits preliminary injunctions where a *prima facie* case for 'actual or threatened misappropriation of a trade secret' is established." *Horner Int'l Co. v. McKoy*, 232 N.C. App. 559, 569–70, 754 S.E.2d 852, 859 (2014) (quoting N.C.G.S. § 66-154(a)) (emphasis omitted). Dominici's acquisition of Biesse America's trade secrets while planning to compete against it and his retention of those trade secrets after joining its competitor in the face of a demand for their return are "precisely the type[s] of threatened

misappropriation, if not actual misappropriation, that the [statute] aims to prevent through the issuance of a preliminary injunction." *TSG Finishing*, 238 N.C. App. at 595, 767 S.E.2d at 878.

34. Dominici and SCM America argue that any harm has been cured by the Court's temporary restraining order, which required the return of Biesse America's confidential information. (*See* Opp'n 19; Dominici Aff. ¶¶ 93–97; Opp'n Ex. 4 ¶¶ 6–8; Opp'n Ex. 5 ¶¶ 7–16; Opp'n Ex. 6 ¶¶ 8–11.) This is simply not the law. "The very nature of a trade secret mandates that misappropriation will have significant and continuous long-term effects." *Barr-Mullin, Inc. v. Browning*, 108 N.C. App. 590, 597, 424 S.E.2d 226, 230 (1993). Dominici acquired substantial amounts of Biesse America's confidential information while intending to compete against it, and he returned the relevant files only after litigation began and under court order. He also intends to perform similar work for SCM America, a direct competitor, albeit in a new territory. A preliminary injunction is not only necessary to prevent irreparable harm to Biesse America but also to protect its rights during the course of this litigation.

35. For the same reasons, the balancing of the equities supports granting a preliminary injunction. *See Williams*, 36 N.C. App. at 86, 243 S.E.2d at 160. The irreparable harm that Biesse America would suffer in the absence of injunctive relief far outweighs any potential harm to Dominici or SCM America if the injunction is issued. Indeed, Dominici and SCM America conceded at the hearing that they would suffer no harm at all from the imposition of an injunction against the use and disclosure of the claimed trade secrets.

36.  SCM America appears to contend that it should be excluded from any injunction because it did not participate in Dominici's actions.  The Court disagrees.  Some of the relevant activity took place after Dominici began his employment with SCM America.  And in any event, SCM America is now on notice of Dominici's activities.  Biesse America is entitled to a preliminary injunction preventing Dominici and all persons in active concert or participation with him, including his employer, SCM America, from retaining, using, disclosing, or distributing any trade-secret information.  *See* N.C. R. Civ. P. 65(d).  Of course, Dominici remains free "to use [his] own skills, experience, and personal relationships with clients."  *Addison Whitney*, 2017 NCBC LEXIS 23, at *23 (collecting cases).

## C. Breach of Contract Claims

37.  Biesse America also argues that it is likely to succeed on its claim for breach of Dominici's employment agreement.  It contends that Dominici has breached at least the agreement's non-compete and non-solicitation provisions.  (*See* Br. in Supp. Mot. Prelim. Inj. 3, ECF No. 16.)  Dominici responds that both provisions are unenforceable and that there is no evidence he has breached the non-solicitation provision.  (*See* Opp'n 9–18.)

38.  The Court concludes that Biesse America has not shown that it is likely to succeed as to the non-solicitation provision.  Its opening brief is silent on that point, and there is no evidence that Dominici has solicited its customers.  Without evidence of a breach, Biesse America is not likely to succeed on the merits.  The Court therefore need not address whether the non-solicitation provision is enforceable.

39. The Court also concludes that Biesse America has not shown a likelihood of success as to the non-compete provision. It appears to be undisputed that Dominici's employment with SCM America runs afoul of the covenant not to compete. But Biesse America, as the party seeking to enforce the covenant, has the burden to prove that it is reasonable in scope "as to both time and territory." *Hartman v. W.H. Odell & Assocs.*, 117 N.C. App. 307, 311, 450 S.E.2d 912, 916 (1994). Biesse America has not shown that it is likely to carry that burden.

40. Our appellate courts have repeatedly observed that "[c]ovenants not to compete between an employer and employee are 'not viewed favorably in modern law.'" *Farr Assocs., Inc. v. Baskin*, 138 N.C. App. 276, 279, 530 S.E.2d 878, 881 (2000) (quoting *Hartman*, 117 N.C. App. at 311, 450 S.E.2d at 916); *accord VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508, 606 S.E.2d 359, 362 (2004). "To be valid, the restrictions on the employee's future employability by others must be no wider in scope than is necessary to protect the business of the employer." *VisionAIR*, 167 N.C. App. at 508, 606 S.E.2d at 362 (citation and quotation marks omitted).

41. Six factors bear on the reasonableness of a geographic restriction:

> (1) the area, or scope, of the restriction; (2) the area assigned to the employee; (3) the area where the employee actually worked or was subject to work; (4) the area in which the employer operated; (5) the nature of the business involved; and (6) the nature of the employee's duty and his knowledge of the employer's business operation.

*Hartman*, 117 N.C. App. at 312, 450 S.E.2d at 917 (citation omitted). Restrictions on time and territory must be considered in tandem—"[a] longer period of time is acceptable where the geographic restriction is relatively small, and *vice versa*." *Farr Assocs.*, 138 N.C. App. at 280, 530 S.E.2d at 881.

42. Here, the non-compete provision has no geographic restriction. It prohibits Dominici from accepting "a competitive position in a competitive company" so long as that company is in the same industry as Biesse America, is in direct competition with Biesse America or Biesse S.p.A., and currently operates "in the same markets as" Biesse America. (Empl. Agr. § 17(a).) As written, this could catch companies that compete against Biesse America in Canada but also operate in Europe or Asia. Dominici is barred from taking a "competitive position" with such companies regardless of where that position may be located.[2]

43. A worldwide covenant not to compete is not per se invalid. *See, e.g., Market Am., Inc. v. Christman-Orth*, 135 N.C. App. 143, 153–54, 520 S.E.2d 570, 578 (1999) (holding that non-compete with "no fixed geographic restriction" was not "unreasonable as a matter of law"). But it must bear some rational relationship to the employer's operations and the employee's duties. And the party attempting to enforce the covenant must show that its unlimited territorial breadth is both reasonable when considered in tandem with the length of the restriction and necessary to protect the party's interests. That's a tall order. It bears noting that

---

[2] During the hearing on its motion for a temporary restraining order, Biesse America's counsel appeared to concede that the non-compete has no territorial limitation. In its reply brief in support of the motion for preliminary injunction, Biesse America argued, for the first time, that the non-compete is limited to the markets in which it operates, namely the United States and Canada. (*See* Reply Br. 6 n.3, ECF No. 30.) At the preliminary-injunction hearing, Biesse America retreated from that position and argued that the non-compete extends at least to the markets of Biesse S.p.A., which would include more than 100 countries around the world. (*See* Opp'n Ex. 2.) Neither of these proposed territorial limitations finds support in the plain language of the non-compete provision. Biesse America also argued at the hearing, in another position not contained in any of its briefs, that the term "competitive position" amounts to a territorial limitation. It is hard to see why this would be so. Competition doesn't necessarily stop at the border. The Court will not read in a territorial limitation where none exists.

Biesse America has not presented, nor has the Court found through its own research, any case in which a North Carolina court has granted a preliminary injunction to enforce a worldwide covenant not to compete.

44. Biesse America has not shown why either its own operations or Dominici's duties would require a worldwide non-compete. In proceedings on the temporary restraining order, the limited record before the Court showed that Biesse America's business was international in scope. It is now clear that "international" means the United States and Canada. (*See* Dominici Aff. ¶ 23.) Dominici had responsibility for only part of that territory. (*See* Empl. Agr. Annex 1.) No evidence suggests that Biesse America has customers outside of the United States and Canada, and no evidence shows where its customers are located within those two countries or even how many there are. It is also unclear whether Dominici actually made contact with customers throughout his assigned territory during his employment with Biesse America. In the absence of such evidence, Biesse America has not shown that it is likely to succeed in proving the reasonableness of the covenant's geographic scope. *See Moonracer, Inc. v. Collard*, 2013 U.S. Dist. LEXIS 126120, at *7 (E.D.N.C. Sept. 4, 2013); *Patch Rubber Co. v. Toelke*, 2013 U.S. Dist. LEXIS 84104, at *7–9 (E.D.N.C. June 14, 2013).

45. The duration of the non-compete does not sufficiently mitigate its boundless territorial scope. In effect, the non-compete would bar Dominici from working anywhere in the world for numerous companies—the nonexclusive list in the employment agreement includes twenty-three—for a period of six months. Biesse

America has not shown why this restriction would be reasonable even though, standing alone, the six-month period seems relatively short.  (Empl. Agr. § 17(a).)

46.     Nor has Biesse America shown that a worldwide non-compete is necessary to protect its legitimate business interests.  One primary purpose of a non-compete is to protect customer relationships when an employee who had close contact with those customers leaves.  *See Hartman*, 117 N.C. App. at 312–13, 450 S.E.2d at 917.  On this record, it is unclear where Biesse America's customers are located and where Dominici's customer contacts were concentrated.  What is clear, though, is that any relevant customers were located somewhere in the United States or Canada.  No evidence suggests that Biesse America needed a worldwide covenant not to compete to maintain its customer relationships.

47.     Biesse America argues that it also has an interest in preserving its confidential information.  Our courts have recognized that protection of confidential information and trade secrets is a legitimate purpose of a non-compete.  *See United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 650, 370 S.E.2d 375, 380–81 (1988); *XPO Logistics Inc. v. Anis*, 2016 NCBC LEXIS 54, at *19 (N.C. Super. Ct. July 12, 2016).  Again, though, Biesse America has not shown why such an interest would support a worldwide non-compete.  Dominici appears to have been a mid-level employee with assigned responsibilities for a single product, albeit over a relatively large geographic area.  Although he had access to confidential information as needed for his duties, there is no evidence that he had the type of wide-ranging access that might be available to a company officer or other high-level employee.  In fact, Biesse America

accuses Dominici of having acquired and taken confidential information outside of his assigned area of responsibility, for which he should have had limited or no access.

48.    There is always some risk that an employee, regardless of station, might skirt the employer's security systems and obtain trade secrets with ill intent.  That risk is not a sufficient reason to impose onerous competition restrictions unconnected to the employee's duties.  As the Court of Appeals for the Fourth Circuit has persuasively observed, "[n]on-competition agreements cannot prevent disclosure [of trade secrets] anywhere in the world and until the end of time, for they would be held unreasonable.  Instead, a non-competition agreement will merely prevent the illegal use of a trade secret next door in the near future, where the use might do the most damage." *Eden Hannon & Co. v. Sumitomo Tr. & Banking Co.*, 914 F.2d 556, 562 (4th Cir. 1990).

49.    Finally, the blue-pencil rule "severely limits" this Court's authority to alter the covenant so as to save it.  *Hartman*, 117 N.C. App. at 317, 450 S.E.2d at 920.  It is perhaps possible not to enforce "a distinctly separable part of the covenant," but the Court may not revise or rewrite it.  *Id.*  At the hearing, Biesse America's counsel suggested striking "or Biesse SpA" from the phrase "in direct competition with Biesse America, Inc. or Biesse SpA."  But this is not a distinctly separable part of the covenant, which later goes on to identify a nonexclusive list of twenty-three companies that qualify as relevant competitors.  There is no evidence as to how many of these companies are competitors of Biesse S.p.A. but not competitors of Biesse America.  And in any event, striking the phrase "or Biesse SpA" would leave in place

a worldwide territorial restriction against employment by competitors of Biesse America.

50.     Biesse America's counsel also argued that if Article 17(a) is unenforceable, a separate non-compete in Article 17(b) would remain enforceable.  That alternative covenant includes a customer-based restriction.  (*See* Empl. Agr. § 17(b).)  Even if Article 17(b) is enforceable, though, Biesse America has not shown any evidence of a breach of this alternative provision.

51.     The Court therefore concludes that Biesse America has not shown that it is likely to succeed on the merits of its claim for breach of the non-compete provision.

### III.
### CONCLUSION

52.     Based on these findings of fact and conclusions of law, the Court **GRANTS** in part and **DENIES** in part the motion for preliminary injunction.  In its discretion, the Court orders that, pending resolution of this action, and until otherwise ordered:

    a.     The temporary restraining order is **DISSOLVED**.

    b.     Dominici and SCM America, and any persons or entities in active concert with them, are **ENJOINED** during the pendency of this action from using or disclosing Biesse America's trade secrets, including but not limited to the confidential information contained in the MTOs, the Discount File, the Markup File, the Masterfile, and the Opportunities Spreadsheet.

    c.     To the extent he has not done so already, as required by the temporary restraining order, Dominici shall return to Biesse America within seven

days of this Order, any confidential information of Biesse America in his possession, custody, or control.

d. Counsel for Dominici may retain one copy of all information delivered to counsel for Biesse America pursuant to paragraph (c) on an attorney-eyes-only basis. Such information shall be accessible only to Jeffrey A. Long, counsel of record for Dominici, and necessary employees of Mr. Long. The parties are urged to confer and present a consent protective order for the Court's consideration as soon as possible.

e. Dominici shall preserve the laptop and tablet he used during his employment with Biesse America and make no efforts to destroy or delete any files save and except as necessary to comply with this Order.

f. In its discretion, the Court determines that the existing bond of $2,000 is adequate to protect the interest of Dominici and SCM America. No further bond shall be required to secure this Order

53. Except as stated, the motion for preliminary injunction is **DENIED**.

54. Finally, Biesse America has requested a forensic examination of the relevant devices used by Dominici. The Court elects not to require such an examination as part of this Order but intends to resolve any dispute in that regard as a discovery matter. Within seven days of the entry of this Order, the parties shall meet and confer in an attempt to resolve or narrow their dispute, if any, as to a forensic examination of the relevant devices. In the event the parties do not reach agreement, Biesse America shall submit an e-mail summary of the dispute, limited

to 750 words, to the law clerk assigned to this case on or before August 30, 2019. Defendants shall submit a responsive e-mail of 750 words or less within three business days thereafter. The Court will then determine whether to set the matter for a status conference or hearing.

        **SO ORDERED**, this the 19th day of August, 2019.


/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
  for Complex Business Cases